# Exhibit A

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | **FOR PUBLICATION** |
| CELSIUS NETWORK LLC, *et al.,* | Case No. 22-10964 (MG) |
| Post-Effective Date Debtors. | Chapter 11 |

| | |
|---|---|
| BARBER LAKE DEVELOPMENT LLC, | |
| Plaintiff, | Adv. Proc. No. 24-04010 (MG) |
| v. | |
| PRIORITY POWER MANAGEMENT, LLC, | |
| Defendant. | |

## MEMORANDUM OPINION AND ORDER GRANTING MOTION TO DISMISS COUNTS IV AND V OF THE BARBER LAKE ADVERSARY COMPLAINT

*A P P E A R A N C E S:*

BAKER BOTTS LLP
*Attorneys for Priority Power Management, LLC*
30 Rockefeller Plaza
New York, New York, 10112-4498
By:    Scott R. Bowling, Esq.
       Nischay K. Bhan, Esq.

910 Louisiana Street
Houston, Texas 77002
By:    Louie E. Layrisson, III, Esq.
       Shelby V. Saxon, Esq.

SEWARD & KISSEL LLP
*Attorneys for Barber Lake Development LLC*
One Battery Park Plaza
New York, New York 10004
By:    John R. Ashmead, Esq.
       Thomas Ross Hooper, Esq.
       Paul B. Koepp, Esq.

**MARTIN GLENN**
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

Pending before the Court is the contested motion (the "Motion," ECF Doc. # 13) of defendant Priority Power Management, LLC ("PPM" or "Defendant"), seeking dismissal of Counts IV and V of the adversary complaint (the "Complaint," ECF Doc. # 1) filed by plaintiff, non-debtor Barber Lake Development LLC ("Barber Lake" or "Plaintiff"), with prejudice.[1] Plaintiff Barber Lake is the successor to debtor Celsius Mining LLC ("Celsius Mining") under a letter of intent ("LOI," ECF Doc. # 1-1) pursuant to a Master Conveyance Agreement between Celsius Mining and Ionic Digital Treasury Inc. dated as of January 31, 2024 (the "Master Conveyance Agreement"). (Complaint ¶ 16.) Pursuant to the Master Conveyance Agreement, Celsius Mining "conveyed the outstanding legal claims and ultimate settlements and recoveries related to the Barber Lake Site to Plaintiff." (Opposition Brief at 7.) Moshin Y. Meghji (the "Litigation Administrator") manages Celsius Mining and has assigned the "Chapter 5 Claims asserted [therein] to Plaintiff." (Complaint at 5 n.3.)

On September 11, 2024, Barber Lake filed a memorandum of law in opposition to the Motion (the "Opposition Brief," ECF Doc. # 21). On September 16, 2024, Barber Lake filed a reply (the "Reply Brief," ECF Doc. # 24) to the relief sought. A hearing on the Motion was held on September 18, 2024.

For the reasons discussed below, the Court **GRANTS** the Motion and **DISMISSES** Counts IV and V with prejudice.

---

[1]     References to ECF docket numbers shall refer to those in the adversary proceeding unless otherwise specified.

# I.    BACKGROUND

## A.  Relevant Background

### 1.   In General

This adversary proceeding centers on a dispute between non-debtor Barber Lake, successor-in-interest to debtor Celsius Mining, and PPM concerning certain payments Celsius Mining made to PPM.  Celsius Mining, managing member of Barker Lake, engaged in cryptocurrency mining, which involves the use of "mining rigs" or "sophisticated hardware devices . . . to verify new blockchain transactions and allow new cryptocurrency assets to enter the market."  (Complaint ¶¶ 18, 20; Motion at 3 (stating that Celsius Mining was in the business of Bitcoin mining).)  Both Celsius Mining and Barber Lake are Delaware-incorporated entities. (Complaint ¶ 16; Motion at 3.)  Meanwhile, PPM is a Texas-based "independent energy management services and consulting firm that, among other things, develops and builds energy infrastructure for its clients."  (Complaint ¶¶ 19, 21; *see also* Motion at 3.)

In connection with its mining business, Celsius Mining contracted with PPM to "develop several sites for the construction of virtual currency mining facilities."  (Complaint ¶ 22.)  One of these sites, which serves as the basis for this adversary proceeding, is located in Mitchell County, Texas (the "Barber Lake Site") within the Electric Reliability Council of Texas ("ERCOT") West Loan Zone in the certificated service area of Oncor Electric Delivery Company (the "Utility").  (Motion at 3.)  PPM acquired the Barber Lake Site in November 2021 "with the intention of working with a Bitcoin miner to develop the site and ultimately earn the fees from such miner's use of [it]."  (*Id.*)

2. <u>The LOI</u>

On February 17, 2022, Celsius Mining and PPM entered into the LOI that set forth the "basic terms and conditions pursuant to which [PPM] and [Celsius Mining] would enter into one or more agreements governing the proposed development by PPM of one or more sites for the construction of virtual currency mining facilities . . . for Celsius [Mining]."  (LOI at 1.)  The LOI defines the foregoing to be the "Transaction" that is the subject of the LOI and its terms.  (*Id.*) Specifically, Barber Lake indicates that this LOI concerned the "development of a 300-megawatt facility at the Barber Lake Site" and its transformation into a virtual currency mining facility (the "Barber Lake Project").  (Complaint ¶ 24; Opposition Brief at 3.)

By its own terms, the LOI "must be fully executed including completion of the payments listed in sections C, D and G by 5:00 P.M. Central Daylight Time on February 18, 2021 to become effective."  (LOI at 1.)  The signature page to the LOI reflects that both parties signed. (*See id.* at 7.)  Moreover, only sections C, D, E, and G of the LOI are binding on the parties.[2] (*Id.* § I ("Except for the provisions of Sections C, D, E and G herein, which shall be deemed to be an agreement and binding upon both PPM and Celsius [Mining], PPM and Celsius [Mining] each understand and agree that . . . this [LOI] does not create . . . a binding or enforceable contract between them, and may not be relied upon by either PPM or Celsius [Mining] as the basis for a contract by estoppel or otherwise . . . .").)

a.  *Relevant Binding Provisions*

Of the four binding provisions, only sections C, D, and G are relevant here.[3]  *First*, Section C provides that Celsius Mining shall pay a $7 million fee (the "Development Fee") to

---

[2]  Section I of the LOI, which sets forth the "limited binding effect" of the LOI, was not included in the list of binding sections of the LOI and, therefore, is itself not technically binding on the parties.

[3]  Section E governs confidentiality, which PPM indicates is not relevant to the Motion.  (Motion at 4 n.4.)

PPM that would become nonrefundable "[o]nce the Development Fee Deliverables are fully satisfied ***and*** the Exclusivity Period has expired [on March 31, 2022] (such date being the "Refund Expiration Date")[.]"[4]  (*Id.* § C (emphasis added).)  Section C further provides: "After consultation with PPM, Celsius may elect not to proceed with the [Barber Lake] Site, in which event, if such election is made prior to the Refund Expiration Date, PPM will refund the Development Fee, minus any reasonable and documented expenses incurred by PPM, to Celsius within seven (7) days."  (*Id.*)

Notably, the parties dispute whether the Refund Expiration Date has expired.  PPM indicates that the *Final Report of Shoba Pillay, Examiner* (the "Examiner's Report," Case No. 22-10964, ECF Doc. # 1956 at 425) interpreted Refund Expiration Date to be March 31, 2022 and concluded that the "Refund Expiration Date [had] not been extended and thus has passed." (Motion at 4.)  Barber Lake instead contends that the Examiner's Report "confuses the Refund Expiration Date with the end of the Exclusivity Period (March 31, 2022) by omitting the express requirement that the Development Fee Deliverables be fully satisfied."  (Opposition Brief at 4 n.3.)  In other words, Barber Lake maintains that the term "Refund Expiration Date" is defined to include both the delivery of the Development Fee Deliverables and the expiration of the Exclusivity Period, the former of which the parties agree has not occurred.  However, as the Court noted at the September 18, 2024 hearing, the Examiner's Report is hearsay.  (*See* Sept. 18, 2024 Hr'g Tr. at 12:24–13:1 (noting that the Examiner's Report is hearsay and not binding).)

*Second*, section D provides that Celsius Mining shall make two payments to PPM totaling $10,147,242 (the "Refundable Payments" and, together with the Development Fee, the "Barber

---

[4]      While not binding, section A(1)(g) provides that "Celsius will pay a $7,000,000 development fee to PPM that will be subject to PPM's delivery of the Development Fee Deliverables to Celsius [Mining's] reasonable satisfaction and further subject to the payment terms as described in Subsection C."  (LOI § A(1)(g).)

Lake Fees"). (LOI § D.) The Refundable Payments are comprised of "(a) $2,350,000 towards

the land acquisition [at the Barber Lake Site] and (b) $7,797,242 which shall be deemed a full

reimbursement to PPM of all amounts previously paid by PPM to the Utility[.]" (*Id.*) Like

Section C, Section D also provides that:

> After consultation with PPM, Celsius [Mining] may elect not to proceed
> with the [Barber Lake] Site, in which event, if such election is made prior
> to the Refund Expiration Date, PPM will refund the Refundable Payments,
> minus any reasonable and documented expenses incurred by PPM, to
> Celsius within seven (7) days; provided, that the Parties may mutually agree
> to an extension beyond the Refund Expiration Date.

(*Id.*) Celsius Mining indicates that it "specifically negotiated and bargained for this language,"

which it believes makes "the Development Fee and Refundable Payments refundable until the

later of (i) the full satisfaction of the Development Fee Deliverables and (ii) the expiration of the

Exclusivity Period." (Complaint ¶ 34.)

*Third*, section G obligates PPM to negotiate exclusively with Celsius Mining regarding

the Barber Lake Site and the Transaction from February 18, 2022 through March 31, 2022 (the

"Exclusivity Period") and "not have any discussions or seek alternative opportunities with any

other potential party which may express an interest in the Transaction or the [Barber Lake] Site."

(LOI § G(1); Motion at 5.) Pursuant to section G(2), Celsius Mining shall also pay PPM

$500,000 (the "Exclusivity Fee"), which will only be refundable if PPM "does not comply with

the terms of this [LOI]." (LOI § G(2).) Notably, section G provides that:

> Prior to the execution of all Definitive Agreements, Celsius [Mining],
> through written notice, may elect not to proceed with the Transaction or
> acquisition of the [Barber Lake] Site, and shall have no liability to PPM
> whatsoever, and in which event, PPM will refund the Development Fee, if
> applicable, and the Refundable Payments, if any, (plus the Exclusivity Fee
> if PPM has not complied with this [LOI]), minus any reasonable and
> documented expenses incurred by PPM, to Celsius [Mining] within fourteen
> (14) days.

(*Id.* § G(1).)  The Exclusivity Fee is not at issue in the adversary proceeding, and Celsius Mining concedes that this fee is "non-refundable."  (Complaint ¶ 26; Motion at 5.)

*b.  Relevant Nonbinding Provisions*

Section A of the LOI, which sets forth the general terms of the Transaction, defines "Development Fee Deliverables" to be:

- a fully executed Transmission/Substation Facility Extension Agreement with the Utility (the "TFEA");
- an executable (approved by the Utility) assignment and assumption agreements for the TFEA; and
- an executable (and approved) Site Transfer Documentation made available for signing by Celsius Mining.

(LOI § A(2)(c).)  "Site Transfer Documentation" is defined in the LOI to be "one or more deeds (including a Surface Deed) conveying to Celsius [Mining] all title, land and property rights to the [Barber Lake] Site."  (*Id.* § A(1)(b).)

PPM also highlights section B of the LOI, which outlines the terms of a definitive Development Services and Security Agreement (the "DSSA") with a target signing date of March 31, 2022.  (Motion at 5 (discussing section B of the LOI).)  The intended DSSA would provide that, "[u]pon signing of all Definitive Agreements and upon completion of all Development Fee Deliverables, PPM will transfer ownership of the land and assign or transfer control of the TFEA to Celsius [Mining]."  (*Id.* § B(1)(b).)  These "Definitive Agreements" include "(i) the TFEA . . . and its associated Assignment and Assumption of Transmission/Substation Facility Agreement, (ii) the DSSA . . . , (iii) the [Engineering, Procurement, Construction, and Management Agreement], (iv) the Energy Management and Consulting Services Agreement, (v) the Energy Management Services Agreement, and (vi) the [Site Transfer Documentation]."  (*Id.* §§ A(1)(b), (e).)

3. <u>Celsius Mining's Payments to PPM</u>

Following Celsius Mining's entry into the LOI, Celsius Mining paid PPM the Barber

Lake Fees in the aggregate total of $17,147,242 in connection with the LOI and the Barber Lake

Project as well as the $500,000 Exclusivity Fee.  (Complaint ¶ 2; Motion at 6.)  As noted, the

Exclusivity Fee is not in dispute here.  (*See id.* at 5.)

During the Exclusivity Period, PPM submits that it worked on the Development Fee

Deliverables and certain of the Definitive Agreements, but Celsius Mining ceased

communicating with PPM regarding the foregoing agreements.[5]  (*Id.* at 6.)  Upon expiration of

the Exclusivity Period on March 31, 2022, PPM indicates that Celsius Mining neither entered

into a Transaction nor elected to not proceed with developing the Barber Lake Site.  (*Id.*)

Accordingly, on April 1, 2022, PPM's Senior Director of Business Development, Tyler

Randolph, emailed Celsius Mining to notify it that the Exclusivity Period expired and, as of

March 31, 2022, the Development Fee that Celsius Mining paid was now nonrefundable.

(Complaint, Ex. B.)  In response to PPM's request that Celsius Mining confirm its

acknowledgment that the fees have been earned and are nonrefundable, Celsius Mining's then-

CEO, Amir Ayalon, responded, "[W]e're confirmed."  (*Id.*)  Celsius Mining disputes that Mr.

Ayalon's response constituted an acknowledgment that (i) any fees were earned and

nonrefundable, or (ii) Celsius Mining had waived or released any claims.  (Complaint ¶ 42.)

Celsius Mining also disputes that his response extended to the Refundable Payments in addition

to the Development Fee.  (*Id.*)

---

[5]     The parties point fingers at each other over the work performed (or not performed) during the Exclusivity
Period.  Celsius Mining contends that PPM has not satisfied the Development Fee Deliverables, failing to provide
Celsius Mining with a fully executed TFEA, an executable and approved assignment and assumption agreement for
the TFEA, or executable and approved Site Transfer Documentation.  (Complaint ¶ 38.)

4. <u>Celsius's Election to Not Proceed and PPM's Sale of the Barber Lake Site</u>

On July 13, 2022 (the "Petition Date"), Celsius Mining and its affiliates filed for chapter 11. (Motion at 6.) PPM represents that it "continued to provide Celsius [Mining] with budget estimates of the infrastructure necessary to complete development of the Barber Lake Site." (*Id.*) During these communications, PPM relayed to Celsius Mining the "urgency of the situation" that "with each day the Barber Lake Site went undeveloped, [PPM] faced greater risk of the Utility and ERCOT revoking the utility capacity necessary for the site." (*Id.* at 5–6.) PPM submits that Celsius Mining, nonetheless, took "no action to proceed with the Barber Lake Site."[6] (*Id.* at 7.) Accordingly, on October 11, 2023, PPM notified Celsius Mining that it had 48 hours to commit to developing the Barber Lake Site by executing the Definitive Agreements, or PPM would begin marketing the site to third parties for sale. (*Id.*; Complaint ¶ 47.)

On October 13, 2023, PPM indicates that "Celsius notified Priority Power that it would not timely commit to proceeding with the Barber Lake Site." (Motion at 7 (citing Complaint ¶ 48).) Specifically, Celsius Mining informed PPM that (i) "it could not execute the definitive agreements by PPM's deadline but offered to continue discussing the Barber Lake Project," and (ii) "*if* it elected to not proceed with the Barber Lake Project, it was entitled to refunds of the [Barber Lake Fees]." (Complaint ¶ 48 (emphasis added).)

On October 25, 2023, Celsius Mining's counsel notified PPM that the Development Fee Deliverables had not been "fully satisfied" and, therefore, Celsius Mining "elected not to proceed with the Barber Lake Project." (Motion at 7; Complaint ¶ 51.) Celsius Mining again requested a

---

[6] Celsius Mining, instead, points the finger at PPM, stating that PPM never presented any evidence that it obtained the final and necessary regulatory approvals. (Complaint ¶ 44.) Celsius Mining states that, as of May 11, 2023, PPM only "provided drafts of certain agreements (that were not Development Fee Deliverables) even though it had only received conditional approval." (*Id.* ¶ 45.) Moreover, despite continuing discussions after that date, Celsius Mining notes that PPM failed to "provide any evidence that it had obtained final regulatory approval for the Barber Lake Site or otherwise satisfy the Development Fee Deliverables." (*Id.* ¶ 46.)

refund of the Barber Lake Fees by no later than November 1, 2023, which PPM did not do.  (*Id.*)

PPM indicates that it did not refund such fees because they had become "nonrefundable under

the LOI" per the April 1, 2022 correspondence.  (Motion at 7.)  PPM subsequently sold the

Barber Lake Site to a third party.  (*Id.*)

### B.  The Adversary Complaint

On July 15, 2024, Barber Lake filed the Complaint against PPM, seeking the return of the

Barber Lake Fees on grounds that such amounts are refundable, which PPM has "wrongfully

refused to return."  (Complaint ¶ 1.)  Annexed to the Complaint are (i) a copy of the LOI as

Exhibit A and (ii) a copy of email correspondence from April 2022 between Amir Ayalon, the

former Chief Executive Officer at Celsius Mining, and Tyler Randolph, Senior Director of

Business Development at PPM as Exhibit B.

Celsius Mining alleges that PPM's refusal to refund the Development Fee and

Refundable Payments constitutes a breach of PPM's binding obligations in sections C and D of

the LOI.  (Complaint ¶ 54.)  And, as a result of such breach, Celsius Mining has been damaged

in an amount no less than $17,147,242, the amount PPM refuses to refund to Celsius Mining.

(*Id.* ¶ 55.)  In addition, Celsius Mining also disputes PPM's assertion that Mr. Ayalon's April 1,

2022 email constitutes a "valid release of all claims for the Development Fee and Refundable

Payments under the [] LOI."  (*Id.* ¶¶ 56–57.)  Finally, Celsius Mining contends that it was

"insolvent at all times relevant to the Complaint" such that, even if the April 1, 2022 email

constituted a release of its claims under the LOI, such release was a "constructive fraudulent

transfer avoidable by [Celsius Mining]."  (*Id.* ¶ 59.)

Accordingly, the Complaint asserts five causes of action:

- <u>Count I</u> – A breach of contract claim for PPM's failure to refund the Barber Lake Fees in connection with the LOI that seeks damages in the amount to be proven at trial of no less than $17,147,242.  (*Id.* ¶¶ 69–70.)

- <u>Count II</u> – A claim for declaratory judgment that the April 1, 2022 email from Celsius Mining to PPM does not constitute a release of any claims under the LOI.  (*Id.* ¶ 82.)

- <u>Count III</u> – To the extent such a release exists, a claim for the avoidance of such a purported release as a constructive fraudulent transfer pursuant to sections 544(b)(1) or 548(a)(1)(B) and recovery of the value pursuant to 550 of the Bankruptcy Code.  (*Id.* ¶¶ 89, 91.)

- <u>Count IV</u> – A claim that seeks the imposition of a constructive trust and recovery of any proceeds or revenues generated from the Barber Lake Site as restitution or, in the alternative, damages for PPM's unjust enrichment in an amount to be proven but no less than $17,147,242.  (*Id.* ¶¶ 102–03.)

- <u>Count V</u> – A claim seeking entry of an order requiring PPM to turn over Celsius Mining's equitable interest in the Barber Lake site and any proceeds or revenue generated from the same pursuant to section 542(a) of the Bankruptcy Code.[7]  (*Id.* ¶ 109.)

**C.  The Motion**

The Motion seeks dismissal of Counts IV and V of the Complaint with prejudice on grounds that Celsius Mining has failed to state a plausible claim of either restitution, constructive trust, or unjust enrichment under state law or turnover pursuant to section 542(a) of the Bankruptcy Code.  (Motion at 8.)

With respect to Count IV, which alleges that PPM was unjustly enriched with its continued development of the Barber Lake Site and entitles Celsius Mining to the "equitable remedies of a constructive trust or restitution," PPM argues that dismissal of this Count is appropriate.  (Motion at 9.)  In support, PPM first contends that Celsius Mining's quasi-contract claims are barred as a matter of law because the Complaint asserts a breach of contract claim based on the same facts, and a valid contract otherwise exists between the parties that is the subject of this dispute.  (*Id.* at 9–12.)  Additionally, PPM argues that Celsius Mining is not

---

[7]    On July 22, 2024, Barber Lake filed a Notice of Lis Pendens in New York County, New York, asserting that this adversary proceeding "involves the title to or seeks to establish an interest or a right in real property" to the Barber Lake Site.  (Motion at 7 n.5.)

entitled to any benefits of the Barber Lake Site because the Complaint itself concedes that
Celsius Mining elected to not proceed with the Barber Lake Project. (*Id.* at 9, 12–13.)
Relatedly, Barber Lake, PPM maintains, also fails to state a claim that would entitle it to a
constructive trust because (i) the unjust enrichment claim is implausible on its face, and (ii)
Barber Lake fails to allege a "close and personal relationship of trust and confidence" between
PPM and Celsius Mining. (*Id.* at 11 (citation omitted).)

As for Count V, which asserts a claim for turnover pursuant to section 542(a) of the
Bankruptcy Code, such claim must be dismissed, PPM asserts, because Celsius Mining is not
entitled to any equitable interest in the Barber Lake Site that would allow it to state a claim for
turnover. (*Id.* at 14.) Celsius Mining elected to not proceed with the Barber Lake Site and, in so
doing, PPM contends, relinquished any interest it held in the development of the Barber Lake
Site or proceeds generated from it. (*Id.*)

### D. The Opposition

Barber Lake opposes the relief sought. With respect to Count IV, Barber Lake asserts
that dismissal is inappropriate because it has adequately stated a claim for unjust enrichment and
restitution. *First*, Barber Lake disputes PPM's assertion that its claim for unjust enrichment is
"duplicative of [its] breach of contract claim." (Opposition Brief at 9–10.) Rather, its unjust
enrichment claim, it believes, is predicated on certain "non-contractual payments in addition to
the Development Fee and the Refundable Payments," which the Complaint adequately alleges
were subsequently used by PPM to improve the Barber Lake Site. (*Id.* at 10–11.) In light of
such, Barber Lake maintains that the LOI does not cover the entire dispute at hand and, in such
an instance, its unjust enrichment claim, pled "in the alternative to [a] breach of contract
claim[]," should therefore survive dismissal. (*Id.* at 10.)

12

*Second*, in connection with its request for the imposition of a constructive trust, Barber Lake clarifies that it is only seeking recognition of "its equitable interest in the Barber Lake Site as a remedy" for PPM's alleged unjust enrichment as opposed to a separate claim for relief. (*Id.* at 12.) Moreover, it disputes PPM's assertion that a fiduciary relationship must exist before a constructive trust remedy may be granted. Both Texas and New York law, Barber Lake argues, are in accord that an unjust enrichment claim can constitute the basis for recognition of an equitable interest in property. (*Id.* at 13–14.) And in New York, in particular, Barber Lake notes that courts do not require strict satisfaction of each element of a constructive trust, recognizing an equitable interest even if the parties are not in a fiduciary relationship. (*Id.*)

As for Count V, which asserts a claim for turnover, Barber Lake argues that dismissal is inappropriate since (i) a court's determination of whether property is subject to a turnover claim is not a basis for such, and (ii) the contingent nature of the claim does not preclude a party from bringing it, particularly where the underlying claim (*i.e.*, Count IV) has been adequately pled. (*Id.* at 15.) To the extent the Court intends to dismiss Count V, Barber Lake requests that any order with respect to this Count be made without prejudice. (*Id.* at 15 n.8.)

### E. The Reply

On September 16, 2024, PPM filed the Reply Brief in support of the Motion. The Reply Brief argues that dismissal of Count IV is appropriate since Barber Lake fails to address Celsius Mining's election to not proceed with the Barber Lake Site. (Reply Brief at 2–3.) This election, PPM contends, is "fatal" to Count IV as the LOI does not provide for Celsius Mining to retain any interest in the Barber Lake Site where it chooses to not proceed. (*Id.* at 2.)

Additionally, PPM argues that there is no dispute over the existence of the LOI and whether the LOI covers the dispute at hand for two reasons. (*Id.* at 7.) *First,* Barber Lake's

13

argument that certain "non-contractual" payments entitle it to an equitable interest and a constructive trust are contrary to the plain language of the LOI and Barber Lake's own allegations. (*Id.* at 4.) *Second*, the Complaint makes no mention of "non-contractual payments," and Barber Lake acknowledges that sections C and D of the LOI, which are binding on the parties, expressly entitle PPM to payment of its expenses. (*Id.*) As Barber Lake cannot succeed on its claim for unjust enrichment, PPM argues, the related equitable remedies Barber Lake seeks—restitution and the imposition of a constructive trust—should also be dismissed. (*Id.* at 2, 8.) Dismissal of Count IV, therefore, is appropriate. (*Id.* at 8.)

Finally, PPM maintains that dismissal of Count V is appropriate because, as Barber Lake recognizes, it is a remedy that is dependent on the success of its unjust enrichment claim. (*Id.*) Because PPM believes that Count IV of the Complaint should be dismissed, it also believes that Count V should be similarly dismissed. (*Id.* at 9.)

## II.  LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, made applicable to adversary proceedings by Rule 7012 of the Federal Rules of Bankruptcy Procedure, a complaint need only allege "enough facts to state a claim for relief that is ***plausible*** on its face." *Vaughn v. Air Line Pilots Ass'n, Int'l*, 604 F.3d 703, 709 (2d Cir. 2010) (emphasis in original) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A party need only plead "a short and plain statement of the claim" with sufficient factual "heft to sho[w] that the pleader is entitled to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 557 (2007) (internal quotation marks and citations omitted). Under this standard, the pleading's "[f]actual allegations must be enough to raise a right to relief above the speculative level," *id*. at 555, and present claims that are "plausible on [their] face," *id*. at 570.

14

"Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *In re Vivaro Corp.*, 524 B.R. 536, 547 (Bankr. S.D.N.Y. 2015) (quoting *Iqbal*, 556 U.S. at 678). Plausibility "is not akin to a probability requirement," but rather requires "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation and internal quotation marks omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citations omitted); *see also Twombly*, 550 U.S. at 555 (stating that a pleading that offers "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do"). Rather, pleadings "must create the possibility of a right to relief that is more than speculative." *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 183 (2d Cir. 2008) (citation omitted). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 663 (citing *Twombly*, 550 U.S. at 556).

Generally, courts use a two-pronged approach when considering a motion to dismiss. *Pension Benefit Guar. Corp. v. Morgan Stanley Inv. Mgmt.*, 712 F.3d 705, 717 (2d Cir. 2013) (stating that motion to dismiss standard "creates a 'two-pronged approach' . . . based on '[t]wo working principles'") (alterations in original) (quoting *Iqbal*, 556 U.S. at 678–79)); *McHale v. Citibank, N.A.* (*In re the 1031 Tax Grp., LLC*), 420 B.R. 178, 189–90) (Bankr. S.D.N.Y. 2009) (stating that courts use a two-prong approach when considering a motion to dismiss). *First*, a court must accept all factual allegations in the complaint as true, discounting legal conclusions clothed in factual garb. *See, e.g.*, *Iqbal*, 556 U.S. at 677–78; *Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 124 (2d Cir. 2010) (stating that a court must "assum[e] all well-pleaded, nonconclusory factual allegations in the complaint to be true") (citing *Iqbal*, 556 U.S. at 678).

15

*Second*, a court must determine if these well-pleaded factual allegations state a plausible claim for relief—"a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679 (citation omitted). "Dismissal is only warranted where it appears beyond doubt that the plaintiff can prove no sets of facts in support of her claim which would entitle her to relief." *In re Nanobeak Biotech Inc.*, 656 B.R. 350, 361 (Bankr. S.D.N.Y. 2024).

Courts deciding motions to dismiss must draw all reasonable inferences in favor of the nonmoving party and must limit their review to facts and allegations contained in (1) the complaint, (2) documents either incorporated into the complaint by reference or attached as exhibits, and (3) matters of which the court may take judicial notice—such as public records, including complaints filed in state courts. *Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide Inc.*, 369 F.3d 212, 217 (2d Cir. 2004) (citations omitted).

### III.   DISCUSSION

#### A. Choice of Law

As a gating matter, section F of the LOI provides that the LOI and the Definitive Agreements "will be governed by and construed in accordance with the laws of the State of Texas." (LOI § F.) However, section F is not binding. (*See id.* § I (providing that only sections C, D, E, and G of the LOI are binding on the parties).) Indeed, both the Motion and the Opposition Brief cite to Texas and New York law. (*See* Motion at 9 n.6 (noting that the Complaint is silent as to which state's law would apply to the Plaintiff's claims of restitution and/or unjust enrichment and cites to both, which are "not materially different" from each other); *see generally* Opposition Brief (discussing both Texas and New York law).) Therefore, the parties are not in dispute that either state's law may apply.

16

Generally, in cases involving a contract with an "express choice-of-law provision[,] [a]bsent fraud or violation of public policy, a court is to apply the law selected in the contract as long as the state selected has sufficient contacts with the transaction." *Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd.*, 230 F.3d 549, 556 (2d Cir. 2000)); *see also Danial v. Langenbach*, No. 12 CV 2983 VB, 2014 WL 5169389, at *9 (S.D.N.Y. Oct. 14, 2014) (stating the same while noting that this is the "well-settled policy of the courts of New York"). In instances, however, where a contract lacks a choice of law provision, the "controlling law would be the contract's 'center of gravity,' which typically is the place of contracting or performance."[8] *TCA Television Corp. v. McCollum*, 839 F.3d 168, 188 (2d Cir. 2016) (quoting *Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1539 (2d Cir. 1997))

Here, that "center of gravity" is Texas and, although not binding, is consistent with the choice of law the parties have selected in section F of the LOI. PPM is a limited liability company formed in the State of Texas with its principal place of business located at 2201 East Lamar Boulevard, Suite 275, Arlington, Texas 76006. (Complaint ¶ 19.) Additionally, while the Transaction may include "one or more sites for the construction of virtual currency mining facilities," its focus nonetheless remains on the Barber Lake Site, which is located in Mitchell County, Texas. (*See* LOI § A(1) (setting forth, as part of the general terms of the Transaction,

---

[8] Similar principles govern the inquiry in Texas in which courts will apply the "most significant relationship" test that considers the place of contracting, negotiation of the contract, performance, location of the subject matter of the contract, and the place of incorporation and place of business of the parties. *See Rmax, Inc. v. Sarnafil, Inc.*, No. CIV.A.3:03-CV-1404-B, 2004 WL 2070967, at *3 (N.D. Tex. Sept. 16, 2004) ("In Texas, parties to a contract may agree that the law of a particular state will apply to their contract and that choice will be honored by the court, provided the chosen state has a reasonable relation to the case. Absent a valid choice of law agreement, Texas courts apply the 'most significant relationship' test found in the Restatement (Second) of Conflict of Laws." (citations omitted)); *Klein v. Fed. Ins. Co.*, 220 F. Supp. 3d 747, 767–68 (N.D. Tex. 2016), *aff'd*, 714 F. App'x 441 (5th Cir. 2018) (stating that, in applying the "most significant relationship" test, courts should consider "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicil[e], residence, nationality, place of incorporation and place of business of the parties." (alterations in original) (quoting RESTATEMENT (SECOND) OF CONFLICT OF LAWS. § 188(2) (1971)).

17

Celsius Mining's commitment to build out and develop the Barber Lake Site that PPM acquired); *id.* § A(2) (describing the Barber Lake Site and indicating, among other things, that the Barber Lake Site "will be understood to be fully developed" when the Development Fee Deliverables are delivered to Celsius Mining); *id.* § H (providing Celsius Mining an option for a period of time to acquire an expansion site in addition to the Barber Lake Site); *id.* at 1 (indicating that the LOI fully executed by "5:00 P.M. **Central Daylight Time** on February 18, 2021 to become effective" (emphasis added); *see also* Opposition Brief at 3 ("Celsius Mining and PPM entered into the [LOI] regarding the development of a 300-megawatt facility at the Barber Lake Site.").)

Therefore, while the LOI's choice-of-law provision is not binding on the parties, application of Texas law would nonetheless be appropriate. Given, however, that the parties are not in dispute over applicable law and have addressed both New York and Texas law, this Opinion will do the same.

### B.  Count IV

To plead an unjust enrichment claim, New York law requires that "(1) the other party was enriched, (2) at that party's expense, and (3) . . . 'it is against equity and good conscience to permit [the other party] to retain what is sought to be recovered.'" *In re Nanobeak Biotech Inc.*, 656 B.R. 350, 368 (Bankr. S.D.N.Y. 2024) (alterations in original) (quoting *Mandarin Trading Ltd. v. Wildenstein*, 944 N.E.2d 1104, 1110 (N.Y. 2011)); *see also Myun-Uk Choi v. Tower Rsch. Cap. LLC*, 890 F.3d 60, 69 (2d Cir. 2018) ("[U]njust enrichment [is] a New York common law quasi-contract cause of action [that requires] the plaintiff to establish: (1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution.") (citations and quotation marks omitted).

18

Generally, a "New York unjust enrichment claim requires no 'direct relationship' between plaintiff and defendant" so long as the connection between plaintiff and defendant is not "too attenuated." *Id.* (quoting *Mandarin Trading*, 944 N.E.2d at 1111). Additionally, assuming a valid contract governing the particular subject matter does not exist, "[s]uch a claim may be pled as an alternative to a breach of contract claim." *LivePerson, Inc. v. 24/7 Customer, Inc.*, 83 F. Supp. 3d 501, 519 (S.D.N.Y. 2015) (citations omitted); *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 516 N.E.2d 190, 193 (N.Y. 1987) ("The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter.") (citations omitted); *see Singer v. Xipto Inc.*, 852 F. Supp. 2d 416, 426 (S.D.N.Y. 2012) ("While a party generally may not simultaneously recover upon a breach of contract and unjust enrichment claim arising from the same facts, it is still permissible to plead such claims as alternative theories.").

Meanwhile, "Texas law . . . recognizes two theories or species of unjust enrichment: one for passive receipt of a benefit that would be unconscionable to retain, and another for wrongfully securing a benefit." *Matter of KP Eng'g, L.P.*, 63 F.4th 452, 457 (5th Cir. 2023) (quoting *Digital Drilling Data Sys., LLC v. Petrolink Servs., Inc.*, 965 F.3d 365, 379 (5th Cir. 2020)). However, as the Fifth Circuit explains:

> The theory available is the one "***actually alleged***." If a plaintiff's unjust enrichment claim is based on a defendant's wrongful securing of a benefit, then a plaintiff must plead facts showing fraud, duress, or the taking of undue advantage. If a plaintiff's unjust enrichment claim is based on passive receipt of a benefit that would be unconscionable to retain, then the plaintiff does not need to plead or prove that the defendant acted wrongfully.

*Id.* (emphasis in original) (citations omitted); *see also In re Sanchez Energy Corp.*, 661 B.R. 522, 547 (Bankr. S.D. Tex. 2024) ("Unjust enrichment occurs when the person sought to be charged has wrongfully secured a benefit or has passively received one which it would be unconscionable

19

to retain.  A person is unjustly enriched when he obtains a benefit from another by fraud, duress, or the taking of an undue advantage.") (citations omitted).  In any event, as with New York, a claim for unjust enrichment under Texas law is "unavailable when a valid, express contract governing the subject matter of the dispute exists."  *KP Eng'g*, 63 F.4th at 457 (quoting *Coghlan v. Wellcraft Marine Corp.*, 240 F.3d 449, 454 (5th Cir. 2001)).

Here, Count IV asserts a claim for restitution and unjust enrichment in connection with "over $17 million in payments [Celsius Mining made] to defendant PPM, including the payment of certain expenses incurred by PPM after the execution of the [LOI], that PPM has wrongfully refused to return."  (Complaint ¶ 93.)  As a result of these "wrongfully withheld payments," Barber Lake alleges that PPM has been unjustly enriched by "retaining the value of the improvements to the Barber Lake Site that were funded with [these amounts]."[9]  (*Id.* ¶¶ 95–96, 98.)  Thus, Barber Lake seeks (i) the imposition of a constructive trust on the Barber Lake Site and any proceeds or revenues generated from the same or (ii) in the alternative, damages in the amount "no less than $17,147,242" by which PPM has been unjustly enriched.  (*Id.* ¶¶ 102–03.)

In its Motion, PPM argues that dismissal of Count IV is appropriate because the Complaint (i) asserts a breach of contract claim (Count I) that is based on the same facts, and a valid contract otherwise existed between the parties, and (ii) concedes that Celsius Mining elected to not proceed with the Barber Lake Project such that Barber Lake is not entitled to any benefits from the Barber Lake Site.  (Motion at 9.)  In response, Barber Lake asserts that (i) the LOI "does not cover the entire dispute at issue in the Complaint," and (ii) it is entitled to a

---

[9]      The Complaint does not make explicit which Texas theory of unjust enrichment Barber Lake is asserting its claim under.  However, the language of Count IV suggests that it is the "wrongful securing of a benefit," which would require a pleading of facts that show "fraud, duress, or the taking of undue advantage."  *KP Eng'g, L.P.*, 63 F.4th at 457.

constructive trust as a remedy because PPM retained the benefit of the improvements to the

Barber Lake Site.  (Opposition Brief at 10, 12.)

As discussed, both New York and Texas recognize that a claim for unjust enrichment is

unavailable when a valid contract governing the particular subject matter exists.  Barber Lake

contends that this is not the case here since the subject matter underlying Count IV extends

beyond the LOI.  Specifically, Barber Lake focuses on the language in the Complaint in

paragraph 43 that states that the payments at issue include the payment of "certain expenses

incurred by PPM after the execution of the [LOI] in connection with the development of the

Barber Lake Site in addition to the Development Fee and Refundable Payments."  (Complaint ¶

43; *see also id.* ¶ 93 (stating in Count IV that these payments include "the payment of certain

expenses incurred by PPM after the execution of the [LOI] that PPM has wrongfully refused to

return to Celsius Mining").)  Barber Lake asserts that these payments, therefore, were "non-

contractual."  (Opposition Brief at 10.)

However, the Complaint states only that these payments were made "***in addition to*** the

Development Fee and Refundable Payments" and makes no mention that the payment of these

expenses were non-contractual, on what basis they were made, and how they fall outside the

scope of the LOI.[10]  (*See* Complaint ¶¶ 43, 93 (emphasis added).)  Indeed, although non-binding,

section A(1)(f) of the LOI, which describes the general terms of the Transaction, provides that:

> Celsius [Mining] will be responsible for ***all of the upfront costs of the***
> ***Transaction, to the extent set forth in the general budget as proposed***,
> including the total land acquisition costs of $2,350,000 (as set forth in
> Subsection D []), any associated easement and land access costs and the
> Utility payments including but not limited to Utility upgrade costs on its

---

[10]      There is no dispute between the parties that the LOI provides for the payment of the Development Fee and
Refundable Payments.  (*See, e.g.*, Complaint ¶ 28 (describing the LOI provision governing the payment of the
Development Fee); *id.* ¶ 32 (describing Celsius Mining's agreement in section D of the LOI to pay the Refundable
Payments).)

> side of the substation and the required Utility collateral, through a series of
> transactions as further described below.

(LOI § A(1)(f) (emphasis added).) Moreover, section A(1)(h) of the LOI provides that Celsius

Mining will also be "responsible for all site improvements, including the cost of the build out of

the medium-voltage electrical distribution infrastructure." (*Id.* § A(1)(h).) Such provisions,

however, may only be relied upon as a "non-binding expression of PPM's and [Celsius

Mining's] understanding with respect to the Transaction." (*Id.* § I.)

A review of the binding provisions of the LOI also supports the notion that the parties

contemplated that Celsius Mining would pay for PPM's expenses. (*See, e.g.,* LOI § C (regarding

the Development Fee, "[a]fter consultation with PPM, Celsius [Mining] may elect not to proceed

with the [Barber Lake] Site, in which event, if such election is made prior to the Refund

Expiration Date, PPM will refund the Development Fee, ***minus any reasonable and documented***

***expenses incurred by PPM***, to Celsius [Mining] within seven (7) days." (emphasis added)); *id.* §

D (regarding the Refundable Payments, "[a]fter consultation with PPM, Celsius [Mining] may

elect not to proceed with the [Barber Lake] Site, in which event, if such election is made prior to

the Refund Expiration Date, PPM will refund the Refundable Payments, ***minus any reasonable***

***and documented expenses incurred by PPM***, to Celsius [Mining] within seven (7) days."

(emphasis added).)

At the September 18, 2024 hearing, counsel to Barber Lake conceded that, subject to

certain conditions, the binding terms of the LOI permitted PPM to deduct the reasonable and

documented expenses it incurred. (*See* Sept. 18, 2024 Hr'g Tr. at 17:2–8 ("In the event that the

Court were to find liability on the contract claim, then with respect to what those damages would

be, PPM, to the extent they were reasonable and documented expenses as set forth in the LOI

that were incurred by PPM, then it would—and not paid for by Celsius Mining—it would . . .

have been able to deduct those from a damages amount.").)  Therefore, as there are provisions in the LOI that contemplate Celsius Mining paying for costs in addition to the Development Fee and the Reimbursable Payments, the Complaint has not pled sufficient factual allegations to support a plausible claim that such payments were non-contractual.

These same binding provisions also provide Celsius Mining with the option to not proceed with the Barber Lake Site, which the parties do not dispute was the path Celsius Mining ultimately chose.  (*See* Complaint ¶ 6 ("On or about October 25, 2023, Celsius Mining elected not to proceed with the transaction."); Motion at 14 ("Celsius elected not to proceed with the Barber Lake Site . . . ."); LOI § C (stating what would happen if Celsius Mining elected not to proceed with the Barber Lake Site); *id.* § D (same).)  The LOI, therefore, covers the dispute at hand, and Barber Lake's assertion that it holds an equitable interest in the Barber Lake Site that would entitle it to any related proceeds and revenue cannot survive dismissal.  (*See* Opposition Brief at 12 (making clear that Barber Lake seeks "recognition of [an] equitable interest in the Barber Lake Site as a remedy for PPM being unjustly enriched by the payments made by Celsius Mining").)  Accordingly, Barber Lake has failed to allege sufficient facts that show that the LOI, which it does not otherwise dispute is a valid contract, does not actually cover the entire matter at hand.  The Court, therefore, need not reach whether the Complaint has adequately pled the elements of unjust enrichment under either New York or Texas law.

Given that Barber Lake has failed to adequately plead a claim for unjust enrichment, its claim for restitution and the imposition of a constructive trust also cannot survive dismissal.  "Under New York law, a constructive trust is an equitable remedy, the key purpose of which is to prevent unjust enrichment."  *In re Chowaiki & Co. Fine Art Ltd.*, 593 B.R. 699, 718 (Bankr. S.D.N.Y. 2018) (citations omitted).  "A party seeking the imposition of a constructive trust

generally must establish that there is 'clear and convincing evidence of: (1) a confidential or fiduciary relationship; (2) an express or implied promise; (3) a transfer in reliance on such a promise; and (4) unjust enrichment.'" *Id.* at 718–19 (quoting *Atateks Foreign Trade Ltd. v. Dente*, 798 F. Supp. 2d 506, 507 (S.D.N.Y. 2011)).  As a remedy, a constructive trust cannot serve as an independent cause of action.  *See id.* at 719.

Texas is no different.  "Under Texas law, a constructive trust is . . . an equitable remedy imposed by law to prevent unjust enrichment resulting from an unconscionable act." *In re Moore*, 608 F.3d 253, 263 (5th Cir. 2010) (quoting *Haber Oil*, 12 F.3d at 436.  Like New York, a constructive trust cannot serve as a cause of action under Texas law. *Id.*  "The two circumstances that generally justify the imposition of a constructive trust are actual fraud and the breach of a confidential or fiduciary relationship." *Matter of Haber Oil Co., Inc.*, 12 F.3d 426, 436 (5th Cir. 1994) (citations omitted).  The elements of a constructive trust under Texas law are "(1) breach of a fiduciary relationship or, in the alternative, actual fraud, (2) unjust enrichment of the wrongdoer, and (3) tracing of the property to an identifiable res." *Id.* at 437.

In other words, the remedy of a constructive trust is contingent upon the finding of, among other things, unjust enrichment.  Barber Lake does not dispute this.  (*See* Opposition Brief at 12 ("Plaintiff has not brought a separate claim for a constructive trust against PPM. Instead, Plaintiff has sought recognition of its equitable interest . . . as a remedy for PPM being unjustly enriched by the payments made by Celsius Mining.").)

Contrary to Barber Lake's argument then, the Court concludes that the contract claim encompasses all of the relief sought by Barber Lake.  Under these circumstances, the unjust enrichment claim cannot survive.

Accordingly, the Court **DISMISSES** Count IV with prejudice.

## C. Count V

Section 542(a) of the Bankruptcy Code governs turnover of property of the estate held by an entity that is not a custodian. *In re DeFlora Lake Dev. Assocs., Inc.*, 628 B.R. 189, 204 (Bankr. S.D.N.Y. 2021).[11] Specifically, section 542(a) provides in relevant part that, subject to certain exceptions:

> [A]n entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title, or that the debtor may exempt under section 522 of this title, shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate.

11 U.S.C. § 542(a). Accordingly, "[t]o prevail on a claim under section 542(a), the party seeking turnover must establish (1) that the property is or was in the possession, custody or control of [another] entity during the pendency of the case, (2) that the property may be used . . . in accordance with § 363 or exempted by the debtor under § 522; and (3) that the property has more than inconsequential value or benefit to the estate." *In re CIL Ltd.*, No. 13-11272-JLG, 2024 WL 1693626, at *45 (Bankr. S.D.N.Y. Apr. 18, 2024) (alterations in original) (internal quotation marks omitted) (quoting *In re McCaffrey*, No. 21-30891, 2023 WL 5612742, at *4 (Bankr. N.D.N.Y. Aug. 30, 2023)).

Generally, "[i]t is fundamental to a turnover claim that the subject property belongs to the estate," and it is the "party seeking turnover bears the burden of proving, by a preponderance of

---

[11] Generally, "the Code permits turnover proceedings to be brought only by a trustee or a debtor in possession." *Int'l Asset Recovery Corp. v. Thomson McKinnon Sec. Inc.*, 335 B.R. 520, 525 (S.D.N.Y. 2005); *see also DeFlora*, 628 B.R. at 205 ("A debtor in possession has the power to bring turnover proceedings to recover property of the estate under § 542."). Here, Barber Lake is a non-debtor asserting a claim for turnover. As noted above, Celsius Mining, a debtor, conveyed its "outstanding legal claims and ultimate settlements and recoveries related to the Barber Lake Site to Plaintiff." (Opposition Brief at 7.) Celsius Mining is the managing member of Barber Lake, and the Litigation Administrator manages Celsius Mining and has assigned the "Chapter 5 Claims" asserted in this adversary proceeding to Barber Lake. (Complaint ¶ 18; *id.* at 5 n.3.) Neither party has raised standing as an issue.

the evidence" that this is so.  *Id.* (citations omitted).  Thus, for "section 542(a) to apply, there

must be no dispute that the property that is the object of the turnover claim is estate property."

*Id.* (citations omitted).[12]

Here, Count V asserts a claim for turnover pursuant to section 542(a) of the Bankruptcy

Code.  The claim seeks entry of an order that requires PPM to turnover Celsius Mining's

equitable interest in the Barber Lake Site and any proceeds or revenues generated from it, all of

which it alleges PPM is not a custodian of despite remaining in PPM's possession.  (Complaint

¶¶ 106–07, 109.)  Barber Lake maintains that Celsius Mining has held "equitable title to [such]

equitable interest" as of July 13, 2022, the Petition Date, rendering it property of the estate.  (*Id.*

¶ 107.)  While the Complaint does not make clear the source of the equitable interest that serves

as the basis for Count V, the Opposition Brief suggests that it is Count IV.  (*See* Opposition Brief

at 15 ("Here, Plaintiff has adequately [pled] its fourth cause of action for unjust enrichment and

restitution seeking the recognition of the equitable interest . . . .  That the Court must first rule on

Plaintiff's fourth cause of action before entering a turnover order does not change the fact that

Plaintiff has adequately pleaded its turnover claim.").)  But, as the Court has ruled above, Count

IV must be dismissed with prejudice.  In light of that result, Count V cannot survive.  Therefore,

the Court also **GRANTS** the Motion and **DISMISSES** Count V with prejudice.

---

[12]    Barber Lake cites to *In re Leco Enters.*, 125 B.R. 385, 391 (S.D.N.Y. 1991) as support for the proposition
that "[s]ection 542(a) claims are not only available for undisputed liquidated debts."  (Opposition Brief at 15.)
However, that case discussed that principle only within the context of section 542(b) and not section 542(a).  *See
Leco*, 125 B.R. at 391 ("This Court declines to follow the reasoning of some courts that Section 542(b), and in turn
Section 157(b)(2)(E), only apply to *undisputed* liquidated debts." (emphasis in original)).

## IV.    <u>CONCLUSION</u>

For the reasons discussed below, the Court **GRANTS** the Motion and **DISMISSES**

Counts IV and V with prejudice.

**IT IS SO ORDERED.**

Dated:    September 25, 2024
          New York, New York

*Martin Glenn*
_____
MARTIN GLENN
Chief United States Bankruptcy Judge
